146 F.3d 942
 331 U.S.App.D.C. 1
 ASSOCIATION OF AMERICAN RAILROADS, Petitioner
v.
SURFACE TRANSPORTATION BOARD and United States of America, Respondents
Western Coal Traffic League, et al., Intervenors
 No. 97-1020.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued May 8, 1998.
Decided June 30, 1998.
 
 On Petition for Review of an Order of the Surface Transportation Board.
 Arvid E. Roach, II argued the cause for petitioner. With him on the briefs were Louis P. Warchot and Kenneth P. Kolson.
 Thomas J. Stilling, Attorney, Surface Transportation Board, argued the cause for respondents. With him on the brief were Joel I. Klein, Assistant Attorney General, U.S. Department of Justice, Robert B. Nicholson and John P. Fonte, Attorneys, Henri F. Rush, General Counsel, Surface Transportation Board, and Ellen D. Hanson, Deputy General Counsel.
 William A. Slover, C. Michael Loftus, Robert D. Rosenberg, Andrew P. Goldstein, Nicolas J. DiMichael and Fredric L. Wood were on the joint brief for intervenors Western Coal Traffic League, et al.
 Before: WALD, WILLIAMS and TATEL, Circuit Judges.
 TATEL, Circuit Judge:
 
 
 1
 Petitioner challenges Surface Transportation Board guidelines for determining the reasonableness of railroad rates in small cases. Finding the challenge unripe, we dismiss the petition.
 
 
 2
 * For much of the nineteenth century, railroads possessed sufficient market power to set rates that were often unjust and unreasonable. See Western Coal Traffic League v. United States, 719 F.2d 772, 775 (5th Cir.1983)[331 U.S.App.D.C. 2] (en banc). Partially in response to this problem, in 1887 Congress created the Interstate Commerce Commission, which tightly controlled rates for almost ninety years and prohibited railroads from responding freely to market forces. See id. As a result of this regulation and the rise of shipping alternatives such as trucks in the mid-twentieth century, railroads increasingly experienced inadequate earnings, struggled to stay solvent, and often went bankrupt. See Western Coal Traffic League v. United States, 694 F.2d 378, 384 (5th Cir.1982), rev'd en banc in part on other grounds, 719 F.2d 772.
 
 
 3
 Responding to the continuing decline of railroads, Congress again acted, this time significantly deregulating the railroad industry through the Railroad Revitalization and Regulatory Reform Act of 1976, Pub.L. No. 94-210, 90 Stat. 31 (codified as amended in scattered sections of 45 and 49 U.S.C.), and the Staggers Rail Act of 1980, Pub.L. No. 96-448, 94 Stat. 1895 (codified as amended in scattered sections of 45 and 49 U.S.C.). Recognizing that railroads must often charge rates well above their variable costs to compensate for their very high fixed costs, these two acts prohibited the ICC, now the Surface Transportation Board, from regulating rates unless the railroad has "market dominance," Pub.L. No. 94-210, § 202(b), 90 Stat. at 35 (codified as amended at 49 U.S.C.A. § 10707(d)(1)(A) (1997)), meaning that railroads must have at least charged a rate with a revenue-to-variable-cost (R/VC) ratio higher than a specified figure--starting in 1980 at 160% and resting currently at 180%. Pub.L. No. 96-448, § 202, 94 Stat. at 1900 (codified as amended and reordered at 49 U.S.C.A. § 10707(d)(1)(A)); see also Burlington Northern R.R. Co. v. ICC, 985 F.2d 589, 595 (D.C.Cir.1993) (discussing Congress' deregulation efforts). Congress further directed that, "[i]n determining whether a rate established by a rail carrier is reasonable," the agency must "recognize the policy ... that rail carriers shall earn adequate revenues." Pub.L. No.96-448, § 201(a), 94 Stat. at 1899 (codified as amended and reordered at 49 U.S.C.A. § 10701(d)(2)). Although Congress wanted to ensure revenue adequacy for railroads, it was also concerned about shippers, urging the agency "to maintain reasonable rates where there is an absence of effective competition." Id. § 101(a), 94 Stat. at 1897 (codified and reordered at 49 U.S.C.A. § 10101(6)).
 
 
 4
 The ICC struggled for many years to develop guidelines for assuring the reasonableness of rates charged by railroads with market dominance. After some experimentation, see, e.g., Iowa Pub. Serv. Co. v. ICC, 643 F.2d 542, 548 (8th Cir.1981) (rejecting ICC rule allowing railroads to charge low-elasticity shippers 7% above full cost), the agency adopted a standard known as "Ramsey pricing," which allows railroads to charge markups in inverse proportion to shippers' demand elasticities, i.e., to charge "captive shippers"--those customers unable to use alternative forms of transportation--rates far above variable cost in order to compensate for their inability to charge high rates to shippers who can easily choose trucks or other forms of transportation. See Burlington Northern v. ICC, 985 F.2d at 595-96. Because accurately measuring elasticities is difficult, however, the agency also adopted a system called Constrained Market Pricing ("CMP") to set limits on how high above variable cost railroads can charge their captive shippers. See id. at 596. For purposes of this case, the most important of these limits--the "stand-alone cost constraint" ("SAC")--prohibits a carrier's rates from exceeding "the rates a hypothetical 'stand-alone railroad' would have to charge in order to recover the costs of building a rail system to carry the complaining shipper's traffic and earn a reasonable return." Burlington Northern R.R. Co. v. STB, 114 F.3d 206, 212 (D.C.Cir.1997).
 
 
 5
 [331 U.S.App.D.C. 3] Although the agency has consistently described the CMP/SAC constraint as the " 'preferred and most accurate procedure available for determining the reasonableness' of rates," Burlington Northern v. ICC, 985 F.2d at 596 (quoting McCarty Farms, Inc. v. Burlington Northern, Inc., 3 I.C.C.2d 822, 840 (1987)), it has also recognized that developing a full SAC study is expensive and therefore inappropriate for cases involving relatively small amounts of money. For this reason, the agency has spent over a decade searching for an alternative to SAC for use in small cases. It originally tried using a standard called R/VC subcomp , which compares the R/VC of the challenged traffic to the average R/VC charged by other railroads for similar traffic. But this court rejected R/VC subcomp , holding that the agency had failed to justify using it to strike a particular rate, especially since "employed regularly and repeatedly, it will reduce rates to the lowest R/VC used in the comparison group." 985 F.2d at 597. The agency therefore abandoned the formula as a bright-line test of reasonableness and resumed its search for another method. Apparently becoming impatient with this search, Congress directed the Board to establish by January 1997 "a simplified and expedited method for determining the reasonableness of challenged rail rates in those cases in which a full stand-alone cost presentation is too costly, given the value of the case." ICC Termination Act of 1995, Pub.L. No. 104-88, Title I, § 102(a), 109 Stat. 803, 810 (codified at 49 U.S.C.A. § 10701(d)(3)).
 
 
 6
 Responding to Congress' directive, the STB issued the guidelines challenged in this case. Rate Guidelines--Non-Coal Proceedings, Ex Parte No. 347 (Sub-No. 2), 1996 WL 741358 (STB served Dec. 31, 1996) ("December Decision"). Because the Board concluded that no one benchmark standing alone would suffice, the guidelines measure the reasonableness of rates in small cases by comparing the challenged rate to three ratios: R/VC subcomp ; R/VC sub 180 , which measures the average markup charged by the challenged railroad on all captive traffic; and RSAM, which represents the average markup over variable cost that the railroad would have to charge captive traffic to recover total costs and a reasonable profit. The Board found that this approach adequately balances the needs of shippers and railroads and explained how it would employ the three ratios:While none of the benchmarks is perfect, we are satisfied that each is instructive for a simplified rate reasonableness analysis. Taken together, they allow us to consider each of the relevant statutory factors. At the same time, each measure serves as a check on the other two. Moreover, ... the three benchmarks are only the starting point for our analysis. They can and should be supplemented, as appropriate, with any particularized evidence that would qualify or modify what one or more benchmarks might otherwise indicate. We are confident that a careful analysis of these three benchmarks, together with whatever supplementary evidence is provided in a case, should enable us to meet our modest objective--to make at least a rough call as to rate reasonableness in those cases where a more precise determination is not possible.
 
 
 7
 Id. at * 21.
 
 
 8
 In issuing these guidelines, the Board rejected petitioner's argument that whenever complaining shippers use the three-ratio approach, railroads should be able to defend by presenting a simplified SAC analysis. Noting that it had already rejected petitioner's computer model for producing a simplified SAC figure--in a test the model had approved a rate with an R/VC exceeding 5,000%, see id. at * 5--the Board concluded that since shippers may only use the three-ratio approach when a SAC analysis would be economically infeasible, see id. at * 25-26 (describing when shippers may use the three ratios), railroads should not then be able to "transform the case into a SAC case," id. at * 28. "In any event," the Board said, "a SAC [331 U.S.App.D.C. 4] presentation by the defendant railroad(s) would not be persuasive, because the defendant railroad lacks the incentive to seek out the least-cost most-efficient standalone service--the objective of the SAC test." Id.
 
 
 9
 After the Board rejected its petition for rehearing, Rate Guidelines--Non-Coal Proceedings, Ex Parte No. 347 (Sub-No. 2), 1997 WL 586968 (STB served Sept. 24, 1997), petitioner sought review in this court, arguing that by promulgating what it refers to as "vague and unilluminating" guidelines, the Board failed to satisfy Congress' command to establish a "simplified and expedited method for determining the reasonableness of challenged rail rates" in small cases. Petitioner also contends that to the extent the guidelines will have any effect on rates they will undermine revenue adequacy and that the Board erred by prohibiting railroads from ever introducing SAC evidence.
 
 II
 
 10
 Before we can consider the merits of the petition, we must determine whether it is justiciable--i.e., whether petitioner has standing and whether its claims are ripe for review. Contrary to the situation we face in most cases, here it is petitioner arguing that the petition may not be reviewable, suggesting not only that it is "unclear" whether it has been "aggrieved" by the guidelines, Brief for Petitioner at 31 (citing 28 U.S.C. § 2344 (1994) (only a "party aggrieved" may obtain review of a Board order)), but also that its claims are "arguably" not ripe for review, see id. at 32. Also unlike the typical case, the Board contends that petitioner has standing and that the petition is ripe, arguing that petitioner has raised a "purely legal question." Brief for Respondents at 22.
 
 
 11
 The counterintuitive positions of the parties actually make sense. Because parties must petition for review of Board orders within sixty days, see 28 U.S.C. § 2344, and because we generally refuse to allow late petitions even when petitioners argue that their claims were unripe during the original sixty-day period, see Eagle-Picher Indus., Inc. v. U.S. EPA, 759 F.2d 905, 914 (D.C.Cir.1985) ("[I]f there is any doubt about the ripeness of a claim, petitioners must bring their challenge in a timely fashion or risk being barred."), petitioner seeks to protect itself by obtaining either immediate review of the guidelines or a statement by this court that, though its claims are not currently justiciable, it may file another petition within sixty days of the date when the claims ripen, see Baltimore Gas & Elec., Co. v. ICC, 672 F.2d 146, 149 (D.C.Cir.1982) ("A time limitation on petitions for judicial review, it should be apparent, can run only against challenges ripe for review."). The Board, apparently believing that its guidelines have a better chance of surviving a judicial challenge in the absence of a specific application, and concerned about the burden that deferral would impose upon small shippers forced to defend the guidelines in future cases, argues that we should review petitioner's claims now.
 
 
 12
 Setting aside the question of whether a party acknowledging it may not be aggrieved and introducing no evidence demonstrating actual injury can ever have standing, we limit our analysis to the petitioner's alternate argument that the case is unripe for review. See Ohio Forestry Ass'n, Inc. v. Sierra Club, --- U.S. ----, ----, 118 S.Ct. 1665, 1670, 140 L.Ed.2d 921 (1998) (deciding case on ripeness grounds even though petitioner argued the case was nonjusticiable on both standing and ripeness grounds); Louisiana Envtl. Action Network v. Browner, 87 F.3d 1379, 1385 (D.C.Cir.1996) ("Because issues of standing, ripeness, and other such 'elements' of justiciability are each predicate to any review on the merits, a court need not identify all such elements that a complainant may have failed to show in a particular case."). The ripeness requirement "prevent[s] the courts, through avoidance of premature adjudication, from entangling [331 U.S.App.D.C. 5] themselves in abstract disagreements over administrative policies, and also [ ] protect[s] the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." Abbott Labs. v. Gardner, 387 U.S. 136, 148, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). To determine whether claims are ripe, we apply a two-part test, evaluating "the fitness of the issues for judicial decision" as well as "the hardship to the parties of withholding court consideration." Id. at 149, 87 S.Ct. 1507.
 
 
 13
 Beginning with the first question, we ask whether the court would benefit from an actual application of the challenged agency action. See Ohio Forestry Ass'n, --- U.S. at ----, 118 S.Ct. at 1670 (court must consider "whether the courts would benefit from further factual development of the issues presented"); Louisiana Envtl. Action Network, 87 F.3d at 1385 (noting that the "classic institutional reason" for postponing review is the "need to wait for 'a rule to be applied [to see] what its effect will be' ") (quoting Diamond Shamrock Corp. v. Costle, 580 F.2d 670, 674 (D.C.Cir.1978)). We have little doubt that judicial resolution of all of petitioner's challenges would benefit from a concrete case.
 
 
 14
 Petitioner first argues that by failing to indicate how the three ratios would be employed in any particular case to review a challenged rate, the Board violated Congress' command to establish a method for determining the reasonableness of rates in small cases. Noting that ratemaking is "not a precise science," the Board responds that the guidelines "establish a general framework" which the Board will use to balance the interests of carriers and shippers. Since the Board has not yet applied the guidelines to invalidate any specific rate--it applied the guidelines only once, finding that the challenged rate was reasonable, see South-West R.R. Car Parts Co. v. Missouri Pacific R.R. Co., 1996 WL 741365 (STB served Dec. 31, 1996)--we have no way of knowing whether the guidelines will provide concrete guidance to railroads or, as petitioners argue, are simply "mush," Paralyzed Veterans of Am. v. D.C. Arena, L.P., 117 F.3d 579, 584 (D.C.Cir.1997), (noting in dicta that "[i]t is certainly not open to an agency to promulgate mush and then give it concrete form only through subsequent less formal 'interpretations' "), cert. denied, --- U.S. ----, 118 S.Ct. 1184, 140 L.Ed.2d 315 (1998). We think that reviewing this claim now would amount to judicial interference before "an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." Abbott Labs., 387 U.S. at 148-49, 87 S.Ct. 1507.
 
 
 15
 Judicial resolution of petitioner's second claim, that the guidelines may undermine revenue adequacy, would likewise benefit from a concrete case. Relying on Burlington Northern v. ICC, 985 F.2d at 597-99, petitioner argues that because the three ratios are expressed as averages, they will tend to set low limits on rates and ratchet these limits downward. Saying that it recognizes these problems, the Board asserts it will avoid them by using all three ratios and other relevant evidence to test the reasonableness of challenged rates. See December Decision, 1996 WL 741358, at * 11 ("We recognize the dangers inherent in relying on average numbers.... That is why ... the r/vc benchmarks can only provide the starting point for a rate reasonableness analysis, not the end result."); id. ("[T]he analysis that we envision would not presume that, simply because a rate produces an r/vc ratio above the average level, it is thereby unreasonable.... Rather, what we must consider is whether the resulting markup is within a reasonable range or zone."); id. at * 18 (discussing the ratcheting problem). Without the benefit of a specific application of the guidelines to facts in a concrete case, we cannot know whether the Board will heed its own advice, or instead fall prey to the pitfalls that petitioner warns of. See Florida Power [331 U.S.App.D.C. 6] & Light Co. v. EPA, 145 F.3d 1414, 1420 (D.C.Cir.1998). At this time, we thus have no way of evaluating petitioner's claim that the Board will employ the guidelines to undermine revenue adequacy.
 
 
 16
 Petitioner's challenge to the Board's exclusion of SAC evidence is equally unfit for judicial review. Although we are unconvinced by the Board's explanation that a railroad's SAC presentation would be unpersuasive because the railroad "lacks the incentive to seek out the least-cost most-efficient stand alone service," id. at * 28--we rejected just this line of reasoning in Burlington Northern v. ICC, 985 F.2d at 599 ("Of course no adjudicator would expect to be able to rely entirely on one side's analysis.")--the Board's explanation that railroads may not convert small rate cases into SAC cases when the shipper has demonstrated the infeasibility of SAC persuades us the issue is not yet fit for review. According to petitioner, because it is possible to develop a low-cost (although not computer model-based) SAC analysis, the Board erred by excluding all SAC evidence. But since shippers cannot use the three-ratio approach unless they first demonstrate the infeasibility of a SAC presentation, the appropriate time for us to review the Board's decision to exclude all SAC evidence will come in a case where the Board allows a shipper to use the three-ratio approach even though the shipper arguably could have used a low-cost SAC presentation instead. Until this happens, we have no way of knowing whether (and if so, on what grounds) the Board will ever exclude low-cost SAC evidence in a case where a presentation based on such evidence would have been feasible.
 
 
 17
 Finding all three of petitioner's challenges unfit for review, we next consider whether deferring review would cause undue hardship to the parties. See Truckers United for Safety v. FHA, 139 F.3d 934, 938 (D.C.Cir.1998) (considering hardship issue after finding challenges not fit for review). We think it would not. To begin with, nothing in either the record or the briefs even suggests that the guidelines have any "current impact" on either petitioner or its members. See Baltimore Gas & Elec., 672 F.2d at 149. Unlike Abbott Laboratories, where the challenged FDA regulations forced drug manufacturers to either spend money to comply or risk criminal penalties, 387 U.S. at 152, 87 S.Ct. 1507, here the guidelines "do not command anyone to do anything or to refrain from doing anything; they do not grant, withhold, or modify any formal legal license, power or authority; they do not subject anyone to any civil or criminal liability; they create no legal rights or obligations," Ohio Forestry Ass'n, --- U.S. at ----, 118 S.Ct. at 1670.
 
 
 18
 According to the Board, deferring review will impose a hardship upon the small shippers who will have to defend the Board's guidelines when petitioner or its members challenge them in some concrete future case. The Supreme Court has already foreclosed this argument, noting that "[t]he ripeness doctrine reflects a judgment that the disadvantages of a premature review that may prove too abstract or unnecessary ordinarily outweigh the additional costs of--even repetitive--post-implementation litigation." Id. 118 S.Ct. at 1671; see also Florida Power & Light, No. 95-1093, 145 F.3d 1414, 1421 (noting that the "burden of participating in further administrative and judicial proceedings ... do[es] not constitute sufficient hardship for the purposes of ripeness"). In any event, we see no reason why the same coalition of shipper trade associations that came together to intervene in this case could not join again when the guidelines are applied in a particular case. And in a final illustration of the parties' odd alignment, the Board contends that the case is ripe because petitioner "[c]learly ... believes that application of guidelines could be harmful to the rail industry." But since petitioner--the party charged with demonstrating injury--has not alleged any harm, we think it best to defer review.
 
 
 19
 [331 U.S.App.D.C. 7] Finding petitioner's challenges unfit for review and that deferring review until the Board applies the guidelines in a concrete case would impose no legally significant hardship upon the parties, we dismiss the petition for lack of ripeness. In the event that the Board applies the guidelines to invalidate a specific rate, petitioner may file a petition for review within sixty days of final agency action. See 28 U.S.C. § 2344; Baltimore Gas & Elec., 672 F.2d at 149-50.
 
 
 20
 So ordered.