Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued February 18, 2010         Decided May 11, 2010

No. 09-1092

BNSF RAILWAY COMPANY,
PETITIONER

v.

SURFACE TRANSPORTATION BOARD
AND UNITED STATES OF AMERICA,
RESPONDENTS

BASIN ELECTRIC POWER COOPERATIVE, INC.
AND WESTERN FUELS ASSOCIATION, INC.,
INTERVENORS

———

Consolidated with Nos. 09-1190, 09-1234

———

On Petitions for Review of Orders
of the Surface Transportation Board

———

*Richard P. Bress* argued the cause for petitioner. With him on the briefs were *Maureen E. Mahoney*, *Lori Alvino McGill*, *Richard E. Weicher*, *Samuel Sipe Jr.*, and *Anthony J. LaRocca*.

*Erik G. Light*, Attorney, Surface Transportation Board, argued the cause for respondents. With him on the brief were *Robert B. Nicholson* and *John P. Fonte*, Attorneys, U.S. Department of Justice, *Ellen D. Hanson*, General Counsel, Surface Transportation Board, and *Thomas J. Stilling*, Attorney. *Raymond A. Atkins*, Attorney, entered an appearance.

*John H. LeSeur* argued the cause for intervenors Basin Electric Power Cooperative, Inc., et al. in support of respondents. With him on the brief were *Christopher A. Mills* and *Peter A. Pfohl*.

*Marty J. Jackley*, Attorney General, Attorney General's Office of the State of South Dakota, *Roxanne Giedd*, Assistant Attorney General, *Wayne K. Stenehjem*, Attorney General, Attorney General's Office of State of North Dakota, *Charles M. Carvell*, Assistant Attorney General, and *Bruce A. Salzburg*, Attorney General, Attorney General's Office of State of Wyoming, were on the brief for amici curiae in support of intervenors and affirmance.

Before: HENDERSON, ROGERS and GARLAND, *Circuit Judges*.

Opinion for the Court by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: BNSF Railway Company ("BNSF") petitions for review of the decision of the Surface Transportation Board ("Board") that rates challenged in 2004 by Western Fuels Association, Inc., and Basin Electric Power Cooperative, Inc. (hereinafter, collectively, "WFA") are

unreasonably high maximum reasonable rates, prescribing future maximum rates, and ordering BNSF to pay reparations.[1]  BNSF contends that the Board's decision was contrary to law because the three-year limit in 49 U.S.C. § 11701(c) had expired before its February 17, 2009 Decision, and so the Board's orders prescribing maximum reasonable rates and ordering the payment of reparations must be vacated and the proceeding dismissed. Alternatively, BNSF contends there was a reopening after the Board's September 7, 2007 Decision,[2] and hence any reparations would be limited from that time forward.  On the merits, BNSF contends the Board was arbitrary and capricious by allowing WFA to revise its traffic route in response to the Board's adoption of new retroactive methodologies for calculating rates, and by modifying the average total cost methodology for allocating revenue from cross-over traffic.

We hold BNSF forfeited the statutory argument by failing to raise it in a timely manner before the Board.  On the merits, we conclude that BNSF's challenge to traffic rerouting is unpersuasive and a matter within the Board's expertise, and that a remand is required for the Board to address BNSF's objection to the modified average total cost methodology as biased

---

[1] BNSF petitions for review of three Board decisions: The February 17, 2009 Decision, as modified by the June 3, 2009 Decision, and the July 23, 2009 Decision on BNSF's compliance. *See W. Fuels Ass'n, Inc. and Basin Elec. Power Coop. v. BNSF Ry. Co.*, STB Docket No. 42088, 2009 WL 415499 (Feb. 17, 2009);  *W. Fuels Ass'n, Inc. and Basin Elec. Power Coop. v. BNSF Ry. Co.*, STB Docket No. 42088, 2009 WL 1567606 (Jun. 3, 2009);  *W. Fuels Ass'n, Inc. and Basin Elec. Power Coop. v. BNSF Ry. Co.*, STB Docket No. 42088, 2009 WL 2221011 (July 23, 2009).

[2] *W. Fuels Ass'n, Inc. and Basin Elec. Power Coop. v. BNSF Ry. Co.*, STB Docket No. 42088, 2007 WL 2590251 (Sept. 7, 2007) ("September 2007 Decision").

because it double counts variable costs; otherwise we affirm. Accordingly, we grant the petitions in part and deny the petitions in part.

**I.**

**A.**

In the Interstate Commerce Commission Termination Act of 1995, Pub.L. 104-88, 109 Stat. 803 (1995) ("ICCTA"), Congress carried forward the shipper protections in the Staggers Rail Act of 1980, Pub. L. 96-448, 94 Stat. 1895 (1980), while continuing the deregulation of the railroad industry it had previously endorsed in the Staggers Act and the Railroad Revitalization and Regulatory Reform Act, Pub. L. 94-210, 90 Stat. 31 (1976). *See* H.R. Conf. Rep. 104-422 (1995), at 194, *reprinted in* 1995 U.S.C.C.A.N. 850; S. Rep. No. 104-176 (1995), at 2-3, 5-6; H.R. Rep. No. 104-311 (1995), at 82-83, *reprinted in* 1995 U.S.C.C.A.N. 793. Thus, a party may file a complaint with the Board, which succeeded the Interstate Commerce Commission ("I.C.C.") as the regulator of the rail industry, challenging the reasonableness of a rate. 49 U.S.C. §§ 11701(b), 10704(b). The Board, upon determining that it has jurisdiction, *id.* §§ 10701(d)(1), 10707(b)-(c), which covers only those railroads that possess "market dominance,"[3] must consider the system-wide pricing policies, *id.* § 10701(d)(2)(A)-(C), and ensure the rail carrier has the opportunity to earn "adequate revenues," *id.* § 10704(a)(2). If the Board finds the challenged rate unreasonable, it "may prescribe" the maximum rate the railroad can charge going forward, *id.* § 10704(a)(1), and the railroad "is liable" for reparations to the complainant, *id.* § 11704(b).

---

[3] A railroad has "market dominance" if its revenues meet or exceed 180 percent of its variable costs for the traffic to which the rate applies. 49 U.S.C. § 10707(d)(1)(A).

The complexity of railroad rate regulation stems in part from determining the proper attribution of costs to those using the railroad's services and facilities. In 1985, the Board promulgated guidelines to calculate rates for shipping coal. *See Coal Rate Guidelines*, Nationwide, 1 I.C.C.2d 520 (1985) ("*Guidelines*"), *aff'd sub nom. Consol. Rail Corp. v. United States*, 812 F.2d 1444 (3d Cir. 1987). The *Guidelines* approach, which was extended to non-coal rates, adopted Constrained Market Pricing ("CMP"), in which rates are set in inverse proportion to shippers' respective demand elasticities, so called "Ramsey pricing." *Guidelines* at 547-48. Under CMP, rates are limited to what is necessary for the carrier to earn adequate revenues based on efficient management and pricing practices. *Guidelines* at 534-42. This determination is made in part based on the stand-alone-cost ("SAC") of a hypothetical carrier or "stand-alone railroad" ("SARR") designed by the complainant to be optimally efficient in providing those lines and facilities needed to serve the complaining shipper. The SAC test determines the maximum rate that the railroad may charge the traffic group by accounting for all the costs of running the SARR, including the cost of building and operation and a reasonable return on investment. Under this test the Board had, over the years, applied Modified Straight-Mileage Prorate ("MSP"), a mileage-based revenue allocation procedure. *See BNSF Ry. Co. v. STB*, 453 F.3d 473, 483-84 (D.C. Cir. 2006) (hereinafter "*Xcel*").

In October 2006, the Board revised the *Guidelines* approach upon concluding the regulatory proceedings had become too complex and too costly. *See Major Issues in Rail Rate Cases*, STB Ex Parte No. 657 (Sub-No.1) (Oct. 30, 2006) at 3 ("*Major Issues Rulemaking*"). Previously, the Board had used the "percent reduction" method, by which it reduced the challenged rate by the same percentage by which the total revenues exceeded the SAC costs. In the final rule, the Board

changed how it would evaluate rate reasonableness by adopting the Maximum Markup Methodology ("MMM")[4] and the Average Total Cost ("ATC") methodology.[5] This court upheld the final rule, including its retroactive application. *See BNSF*

---

[4] Under MMM, the parties calculate the revenue-to-variable cost ("R/VC") needed to cover the SARR's total costs in one year to determine the Benchmark R/VC Ratio. The Board then compares the Benchmark R/VC Ratio to the actual R/VC ratio for each shipper in the traffic group on the SARR to determine if the SAC costs assigned to that shipper's traffic would exceed what the SARR could charge the shipper for the traffic. "Where the actual charge is less than the share of SAC costs that would otherwise be allocated" to a particular shipper under the Benchmark R/VC ratio, "the difference should be reapportioned to the remaining traffic group" and this should be repeated "until no movement in the traffic group is assigned a higher share of the SAC costs than its actual charge." *Major Issues Rulemaking* at 14.

[5] To allocate revenues for cross-over traffic between the defendant railroad and the SARR, the Board abandoned MSP, which it had used for over a decade, *see Xcel*, 453 F.3d at 484. According to this court, the "critical flaw" in this procedure was that it failed to account for "'economies of density' — the principle that the more traffic on a given stretch of rail, the lower the average cost (and hence the lower the cross-over-traffic revenue that should be attributed to it)." *Major Issues Appeal*, 526 F.3d at 782-83 (citing *Xcel*, 453 F.3d at 473). To address the economies of density and "the fact that at some point, higher density no longer results in lower average costs," *id.* at 783, the Board adopted ATC "to derive a system-average fixed cost per route mile," *Major Issues Rulemaking* at 34. Average fixed cost is added to average variable cost to set the average total cost per ton. *Id.* To determine the proper allocation of revenues for the segment, the Board divides the average total cost of the segment by the average total cost of the railroad system. *Id.*

*Ry. Co. v STB*, 526 F.3d 770 (D.C. Cir. 2008) ("*Major Issues Appeal*").

## B.

From 1984 to 2004, BNSF transported WFA's coal under a long-term contract in which the rate gradually decreased from $4 per ton in 1984 to $3 per ton in 2004. When the contract expired, BNSF and WFA were unable to reach a new agreement and BNSF set a common carrier rate of $6 per ton. Although this rate was, due to the proximity to the Powder River Basin, "one of the lowest transportation rates any utility pays to acquire PRB coal," September 2007 Decision at 2, the revenue to variable cost ratio for these movements was very high, beginning at 481 percent and adjusting upward over time to 843 percent according to WFA.

On October 19, 2004, WFA filed a verified complaint with the Board, seeking to demonstrate the unreasonableness of BNSF's rates under the SAC test. WFA designed a SARR called the Laramie River Railroad ("LRR"), which contained some cross-over traffic and allocated revenues from the cross-over traffic using MSP. BNSF filed an answer and the Board granted a motion allowing mediation to continue through January 31, 2005. Once mediation efforts ended, the parties filed evidentiary presentations and in December 2005 they filed final briefs in accordance with a briefing schedule that had been extended a number of times.

Then, in February 2006 the Board held in abeyance the pending WFA and AEP Texas North Company ("AEP") proceedings while it conducted the *Major Issues Rulemaking*. At the time, the Board announced its intent to apply to the pending cases whatever new methodology it adopted in three areas, including cross-over traffic. It also stated that at the end of the rulemaking parties in the pending cases would be

afforded an opportunity to submit supplemental evidence comporting with changes adopted in the rulemaking, and that "the time frames for issuing a Board decision in those two cases are tolled." *Notice of Proposed Rulemaking*, STB Ex Parte, No. 657 (Sub-No.1) (Feb. 26, 2006) ("*NPRM*") at 3; *see* 49 U.S.C. §10704(c) (requiring the Board to issue a decision within 90 days of the close of the record). In October 2006, the Board promulgated the final rule replacing the percentage reduction methodology with MMM and the mileage-based revenue allocation methodology ("MSP") with ATC. *See Major Issues Rulemaking* at 14, 31. On November 8, 2006, the Board ordered the parties to submit supplemental evidentiary presentations, based on the existing SARR proposal, so the Board could apply the new methodologies; the parties completed their supplemental filings by April 2007.

In the September 2007 Decision, *supra* note 2, the Board found that BNSF has market dominance over the transportation at issue. It also found that WFA had failed to establish "on this record" that the challenged rates are unreasonably high, *id.* at 3, but offered WFA an opportunity to submit supplemental evidence bearing on the new retroactive methodologies. Noting the warning of this court, *see supra* note 5, the Board rejected the idea of continuing to apply "flawed or discredited procedures" while concluding that "fairness dictates that WFA have an opportunity to modify its SAC presentation in light of the new revenue allocation methodology." September 2007 Decision at 20. The Board stated: "Generally, it is not the Board's practice to permit complainants to redesign their case in light of subsequent Board decisions"; however, "[i]n this case, . . . the change from MSP to ATC would affect the basic design of a SAC case" because WFA might not have included all of the traffic offering limited revenue contribution or might have changed the configuration of the LRR under ATC. *Id.* The Board gave WFA thirty days to decide, allowing WFA to

increase or decrease the traffic group and change the configuration of the LRR and to submit evidence on all related issues. The Board stated it "will discontinue this proceeding" if WFA does not seek to present new SAC evidence. *Id.*

Upon denying the parties' petitions for reconsideration, the Board explained further that "WFA could have been unfairly prejudiced by not knowing when it designed the LRR that the ATC revenue allocation procedure would be applied to its case." February 2008 Denial of Reconsideration at 2.[6] In response to BNSF's argument that there was nothing unfair about applying ATC to WFA's case, the Board emphasized that "[u]sing ATC rather than MSP changes the incentives for a shipper in the selection of the traffic group to be used." *Id.* at 3. Acknowledging that allowing the supplemental evidentiary presentation "is an unusual measure," the Board cited cases to show "it is not unprecedented," *id.*, and noted that the parties had agreed to a procedural schedule through July 2008 that would include time for additional discovery.

In a supplemental evidentiary presentation filed on May 13, 2008, WFA redesigned its SARR to change LRR's traffic route to exclude some marginally profitable traffic and to include high revenue traffic destined for the WestStar Jeffrey Energy Center ("Jeffrey traffic"). BNSF, in reply of July 14, 2008, argued that the complaint should be dismissed because WFA's use of rerouted traffic was "inconsistent with the limited reopening right afforded by the Board"and a "blatant attempt to game the Board's new Maximum Mark-Up Methodology ('MMM')." BNSF July 2008 Reply at 5, 6. BNSF also renewed a double-counting objection to the modification of

---

[6] *W. Fuels Ass'n, Inc. and Basin Elec. Power Coop. v. BNSF Ry. Co.*, STB Docket No. 42088, 2008 WL 542600 (Feb. 28 , 2008) ("February 2008 Denial of Rehearing").

ATC adopted in the September 2007 Decision that it had raised in petitioning for reconsideration.  And, for the first time, BNSF argued that the WFA proceeding would have to be dismissed in view of the three-year limit in section 11701(c), which, BNSF asserted, commenced with the filing of WFA's verified complaint of October 19, 2004 and the Board's initiation of a formal investigation on that date.  *See id.* at 47-49.  Alternatively, BNSF argued that the September 2007 Decision was a final decision, such that the extended WFA proceeding was a reopening and no reparations could be awarded for rates charged prior to that time, citing *Arizona Grocery Co. v. Atchison, Topeka & Santa Fe Ry. Co.*, 284 U.S. 370, 389-90 (1932).

In rebuttal of August 15, 2008, WFA noted that "[l]ong after the record initially closed in this case, the Board adopted several new SAC standards in [the] *Major Issues* [*Rulemaking*] and retroactively applied them," and that WFA had "repeatedly objected to the Board's actions, [arguing] that WFA[] would have modeled a different SARR had the new . . . rule the Board adopted in [the] *Major Issues* [*Rulemaking*] to set SARR cross-over traffic revenue divisions been in effect when it modeled the LRR."  WFA August 2008 Rebuttal at 2-3.  WFA also called the Board's attention to the due process requirements identified in *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 433 (1982), that a complainant has the right to an "opportunity to present his case and have its merits fairly judged," and in *Hatch v. FERC*, 654 F.2d 825, 835 (D.C. Cir. 1981), that where rules have changed in the middle of the case "litigants must have a meaningful opportunity to submit conforming proof."  *See* WFA August 2008 Rebuttal at 65.  WFA emphasized that BNSF had not objected to the procedural schedules advancing the proceeding to July 2008 and had stated in filings during the *Major Issues Rulemaking* that delay caused by the rulemaking would not prejudice WFA's case.  *See id.* at 66.

In the Decision of February 17, 2009, *supra* note 1, the Board found that the challenged rates were unreasonable, prescribed maximum lawful rates, and ordered BNSF to pay reparations to WFA. In response to the parties' joint petition, the Board, by Decision of June 3, 2009, incorporated technical corrections to the February 2009 Decision. In the Decision of July 23, 2009, the Board found that although BNSF had generally used the correct method to calculate the maximum lawful rates, it erred in its indexing approach, and ordered BNSF to establish rates, within thirty days, in accordance with the approach in *Oklahoma Gas & Elec. v. Union Pacific R.R.*, STB Docket No. 42111, 2009 WL 2205337 (July 23, 2009). BNSF petitions for review.[7] *See* 28 U.S.C. §§ 2321, 2342, 2344.

## II.

BNSF contends that section 11701(c) required the Board to dismiss the WFA proceeding three years after WFA filed its verified complaint on October 19, 2004. The Board responds that this ignores statutory text in section 11701(a) that introduces ambiguity as to whether the three-year limit applies only to investigations initiated by the Board rather than by complaint, and would raise serious constitutional concerns because dismissal without a final decision on the merits would likely deprive complainants of due process. WFA concurs with the Board's interpretation of section 11701(c) and agrees application of the three-year limit to its complaint would violate its basic due process right to receive a final decision on its claim after a full and fair hearing.

---

[7] On October 21, 2009, the Board ordered BNSF within thirty days to pay reparations (with interest) to WFA. *W. Fuels Ass'n, Inc. and Basin Elec. Power Coop. v. BNSF Ry. Co.*, STB Docket No. 42088, 2009 WL 3398892 (Oct. 21, 2009).

12

Section 11701 provides:

(a) *Except as otherwise provided in this part*, the Board may begin an investigation under this part *only on complaint*. If the Board finds that a rail carrier is violating this part, the Board shall take appropriate action to compel compliance with this part.

(b) A person . . . may file with the Board a complaint about a violation of this part by a rail carrier providing transportation or service subject to the jurisdiction of the Board under this part. * * * The Board may dismiss a complaint it determines does not state reasonable grounds for investigation and action. However, the Board may not dismiss a complaint . . .because of the absence of direct damage to the complainant.

(c) A formal investigative proceeding begun by the Board under subsection (a) of this section is *dismissed automatically* unless it is concluded by the Board with administrative finality by the *end of the third year* after the date on which *it* was begun.

49 U.S.C. § 11701 (emphasis added).

BNSF contends the plain text of section 11701(c) provides that the three-year limit applies only to "formal investigative proceeding[s] begun by the Board under subsection (a)." Pet'r's Br. 28. Subsection (a) authorizes the Board to initiate, BNSF maintains, only one type of proceeding: those brought on complaint. WFA filed a complaint and so, BNSF concludes, the three-year limit in subsection (c) applies to the WFA proceeding, commencing to run on the date WFA filed its complaint. BNSF notes that, in amending subsection (a) to

strike text authorizing the Board's predecessor to begin an investigation under this subtitle "on its own initiative," 49 U.S.C. § 11701(a) (as recodified in 1978), Congress in the ICCTA cut back on the Board's authority to initiate formal investigations. *See* H.R. Conf. Rep. 104-422, at 194. BNSF rejects the notion that due process is implicated, suggesting WFA's complaint is not a protected property interest and recasting WFA's "real objection" to be that the rules of the game changed after it filed its complaint in a way that prevented "fair" adjudication within the three-year limit, a claim under *Hatch* that BNSF maintains was rejected in the *Major Issues Appeal*, 526 F.3d at 784. *See* Pet'r's Br. 36-40. BNSF thus concludes, the WFA proceeding should have been terminated automatically pursuant to section 11701(c) on October 19, 2007 and the Board's subsequent orders should be vacated as contrary to law.

The Board does not suggest the deregulatory context is not a relevant indicator of Congress' intent, only that Congress' failure in the ICCTA to amend section (c) (other than making technical revisions) indicates that Congress intended the Board's interpretation — that the three-year limit applies only to Board-initiated investigations — to continue in force. It notes Congress' contemporaneous addition to subsection (a) of the phrase "except as otherwise provided in this part," such that the ICCTA did not disturb the Board's authority to initiate certain formal investigations under other provisions of Title 49, as, for example, to exercise temporary authority to direct rail operations in rail service emergencies pursuant to 49 U.S.C. § 11123. *See also id.* §§ 10745, 10706(d), 10502(b). Essentially, the Board maintains, as it did in *Xcel*, 456 F.3d at 478-79, that because Congress cannot have intended to punish a complainant for agency inaction, the three-year limit must be read to apply only to investigations begun by the Board on its own initiative. It thus reads "formal investigative proceeding"

to refer to such proceedings pursuant to the "otherwise provided" clause of subsection (a). The Board notes its interpretation is consistent with the I.C.C.'s reading of 49 U.S.C. §11701 (as recodified in 1978). Because the term "formal investigative proceeding" had an established meaning before the ICCTA was enacted, the Board suggests Congress is presumed to have been aware of that interpretation when it retained the phrase in section 11701(c) in 1995. Any other reading, it maintains, would produce an absurd, unfair, and perhaps even unconstitutional result by depriving a complainant of a decision on the merits of its rate complaint where the delay was not the complainant's fault, perversely rewarding the railroad that managed to prolong a rate proceeding beyond the three-year limit. WFA's right to due process, the Board maintains, would be violated in two ways: lack of a fair opportunity to present its case after the Board changed the rule on revenue allocation for cross-over traffic and failure to receive a final agency decision on the merits.

The conflicting statutory interpretations reprise the arguments made by BNSF and the Board in *Xcel*, 453 F.3d at 479 (D.C. Cir. 2006). This court observed then that:

> The Board's concern with due process may be well-founded. *See Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428, 102 S. Ct. 1148, 71 L. Ed.2d 265 (1982) (holding "a cause of action is a species of property protected by the Fourteenth Amendment's Due Process Clause" and therefore could not constitutionally be extinguished by expiration of the 120-day period for state agency to convene a fact-finding conference). We need not resolve the issue of the three-year limit, however, because BNSF failed to raise the argument in a timely manner.

*Id.* So too here.

In *Xcel*, the court explained that "[a] reviewing court generally will not consider an argument that was not raised before the agency 'at the time appropriate under its practice.'" 453 F.3d at 479 (quoting *United States v. L.A. Tucker Truck Lines, Inc.* 344 U.S. 33, 37 (1952)). In that case, BNSF raised the three-year limit argument after three and one half years of proceedings, when the Board had ruled against it on the merits and BNSF was petitioning for reconsideration. Without identifying "the exact moment the argument was forfeited," the court concluded "it could not have been later than when the Board decided the case because the criteria for granting reconsideration are limited by statute." *Id*. (citing 49 U.S.C. § 722(c) (requiring "material error, new evidence, or substantially changed circumstances")). The court further rejected BNSF's objection that the "automatic" dismissal provision in section 11701(c) was a "'mandatory directive' . . . leav[ing] no discretion in the [Board] to treat its claim as having been forfeited," stating that "[e]ven a defect in the jurisdiction of an agency . . . when not timely raised before that agency is forfeit. . . unless it 'concerns the very composition or constitution of that agency,'. . . which BNSF's objection does not." *Id*. (internal citations omitted).

In the instant case, BNSF first argued before the Board that the three-year limit required the WFA proceeding be dismissed in July 2008, after three and three-quarters years of proceedings and nine months after, according to BNSF, the three years had run from the filing of WFA's verified complaint. This also was ten months after the September 2007 Decision and five months after the Board denied BNSF's petition for reconsideration of the September 2007 Decision. BNSF mentioned the three-year limit in its petition for reconsideration but, as it conceded during oral argument, it did not argue the proceeding had to be

dismissed, only that it was "unfair to BNSF to allow this proceeding to continue beyond the three-year cut off . . . when the complainants, who have the burden of proof, failed to demonstrate in their original SAC evidence that they are entitled to any relief." BNSF October 2007 Pet. for Reconsideration at 2. In denying reconsideration the Board noted the parties had agreed to a procedural schedule (through July 2008) that would include time for additional discovery. February 2008 Denial of Reconsideration at 8. These are circumstances of forfeiture similar to those identified in *Xcel*, 453 F.3d at 479.

BNSF's explanation during oral argument for its delay in raising the three-year limit argument, that it viewed the September 2007 Decision as a final decision and the later proceeding as a reopening, does not negate the forfeiture. The September 2007 Decision indicated on its face it was not a final decision, affording WFA thirty days to decide whether it wanted to submit supplemental evidence on a new or revised SARR and stating that unless WFA decided to supplement its evidence the proceeding "*will* be discontinued." September 2007 Decision at 20 (emphasis added). Even though BNSF could have filed a motion to dismiss at any point in the WFA proceeding, *see* 49 C.F.R. § 1111.5, it stood silent before the Board after the denial of its petition for reconsideration in February 2008 and while WFA prepared and presented a revised SARR to the Board in May 2008. BNSF also stood silent before the Board after the Board filed a motion on May 19, 2008 to dismiss the appeal of the September 2007 Decision as premature,[8] waiting two months after the Board's motion to argue the three-year limit before the Board, *see* BNSF July 14, 2008 Reply at 47-49, even though BNSF had argued before this court in response to the

_____

[8] This court dismissed the appeal. *See W. Fuels Ass'n, Inc. and Basin Elec. Power Coop. v. BNSF Ry. Co.*, Docket No. 08-1167 (D.C. Cir. Jun. 3, 2009).

Board's motion to dismiss that the pending proceedings were otherwise improper because they extended beyond the three-year limit, citing *Xcel*'s holding on "waiver," 453 F.3d at 480. *See* June 3, 2008 BNSF Resp. to Board's Mot. to Dismiss at 14-15, *W. Fuels Ass'n, Inc. and Basin Elec. Power Coop. v. BNSF Ry. Co.*, Docket No. 08-1167 (D.C. Cir. Jun. 3, 2009). Under the circumstances BNSF did not timely present the three-year limit argument to the Board. *See Xcel*, 453 F.3d at 479.

Although this court has held that a forfeiture can be forfeited by failing on appeal to argue an argument was forfeited, *see Empagran S.A. v. F. Hoffman-Laroche, Ltd.*, 388 F.3d 337, 344 (D.C. Cir. 2004); *Bowden v. United States*, 106 F.3d 433, 438-39 (D.C. Cir. 1997), that precedent is inapplicable. The Board never acquiesced in BNSF's view that section 11701(c)'s three-year limit applied to complaint-initiated investigations and rejected BNSF's argument on the merits when it was first raised in July 2008.

## III.

On the merits, BNSF contends the Board's Decision is arbitrary and capricious for allowing WFA to reroute traffic in its May 2008 evidentiary presentations and in modifying ATC. Our review is deferential, looking to see whether the decision is "'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,'" 5 U.S.C. § 706(2)(A), (E), bearing in mind that '[w]here an agency has rationally set forth the grounds on which it acted, . . . this court may not substitute its judgment for that of the agency.'" *Xcel*, 453 F.3d at 480 (internal citation omitted).

BNSF maintains that the Board did not hold WFA to its burden to justify its traffic selection and failed to explain why WFA's re-routing of traffic was consistent with SAC principles.

BNSF objected in July 2008 to WFA's revised traffic selection that included high rated "Jeffrey traffic" on the ground that it was beyond what the Board had authorized in the September 2007 Decision. On appeal, BNSF suggests that the "Jeffrey traffic" "shares virtually no facilities with WFA's traffic," Pet'r's Br. 46, and that together with the dropped profitable but lower-rated traffic it did nothing to advance the objectives of the SAC test.

The Board determined that WFA's replacement of the lower-rated 19 million tons of traffic with higher-rated "Jeffrey traffic" was within the "broad flexibility" allowed by the *Guidelines* at 543-44. Explaining that "every choice made by a complainant in designing a SARR will be done with an eye to reducing the maximum lawful rate produced under the SAC test" and that the traffic choice is valid "[s]o long as the complaint does not violate any SAC rule or principle in the process," February 2009 Decision at 7, the Board concluded the "Jeffrey traffic" met the criteria for inclusion by demonstrating that "the route is reasonable and would meet the shipper's transportation needs," *id.* at 11 (citing *Tex. Mun. Power Agency v. BNSF*, 6 STB 573, 589 (2003)).

The court will defer because the Board's determination invokes its expertise, *see Major Issues Appeal*, 526 F.3d at 774, and we find no fault with the Board's reasoning. The Board's approval of the rerouted traffic is consistent with the Board's precedent that the complainant designing the system from scratch has "broad flexibility to develop the least costly, most efficient plan" and to select the traffic group, including cross-over traffic, for its SARR. *Guidelines* at 543-44; s*ee Duke Energy Corp. v. CSX Transp., Inc.*, 7 STB 402, 417 (June 2003-Dec.2004), 2004 WL 250254, at \*10-\*11. BNSF presents no persuasive argument to question the Board's reasonable distinction between requiring a compelling justification for

changing a traffic route only where the selected traffic shares no facilities in the real world, and requiring only that the complainant account for any off-SARR changes where the selected traffic shares at least some facilities in the real world, as does the "Jeffrey traffic." *See* February 2009 Decision at 11 n.16; *see also Duke Energy*, 7 STB at 418, 2004 WL 250254, at *11; *Pub. Serv. Co. of Colo. d/b/a Xcel v. Burlington N. and Santa Fe Ry. Co.*, 7 STB 589, 607-08 (June 2003-Dec.2004), 2004 WL 1428724, at * 12.

BNSF also contends the Board's modification of ATC in the September 2007 Decision was arbitrary and capricious because modified ATC fails appropriately to consider economies of density and artificially inflates the revenues attributable to the SARR. It suggests that in the *Major Issues Rulemaking* "[t]he Board recognized that it must consider the relative average total costs of each segment, rather than their average variable costs, in order to take adequate account of economies of density." Pet'r's Br. 50 (citing the *Major Issues Rulemaking* at 34-35 and the *NPRM* at 20). BNSF maintains that under the Board's two-step approach — by assigning revenues to cover the variable costs in step one without reflecting economies of density, and by then allocating any remaining revenues to cover the fixed costs plus the variable cost in step two taking economies of density into account — variable costs are counted twice. In BNSF's view, this "all but ignores the fundamental purpose of ATC (accounting for the economies of density)." Pet'r's Br. 51. The effect, BNSF claims, is that the high-density SARR segments tend to receive a disproportionately large share of revenues leaving the incumbent carrier with insufficient revenues to cover the proportionally higher cost of lower-density off-SARR lines.

The Board determined upon applying ATC, as adopted in the *Major Issues Rulemaking*, that it had not accounted for a

situation in which low-rated cross-over traffic did not cover its own variable costs for portions of the rail movement. *See* September 2007 Decision at 14. The Board explained that "[b]ecause the traffic group includes considerable traffic with total revenue either below or barely above variable cost, and because the off-SARR segments of the movements have lower densities, the practical effect of the parties' approach would be to drive the R/VC percentages of the movements below 100%," meaning "the on-SARR revenue allocation for those movements would be insufficient to cover the variable cost . . . of handling traffic for the highest-density portion of a movement." *Id.* at 14. "To avoid such an illogical and unintended result," *id.*, the Board modified ATC. "Instead of applying ATC allocation procedure to total revenue, we will apply the same allocation procedure to total revenue *contribution*" so that "the revenue assigned to the on-SARR part of a cross-over movement will equal the variable cost to haul the traffic over the facilities replicated by the SARR plus the portion of available revenue contribution allocated in accordance with ATC." *Id.* (emphasis in original).

On appeal the Board acknowledges that it "did not specifically mention 'double-counting'" in denying BNSF's petition for reconsideration of the September 2007 Decision. Resp't Br. 63. Rather, the Board stated that modified ATC would not reintroduce bias because it is "even-handed." February 2008 Denial of Reconsideration at 4-5. The Board noted that BNSF had previously suggested adoption of a similar methodology, the Density Adjusted Revenue Allocation ("DARA"). *Id.* at 5. However, the Board had rejected DARA as being "insensitive to the actual economies of density associated with particular movements" and observed that ATC, as adopted in the *Major Issues Rulemaking*, "does not suffer from the deficiency that led to the Board's rejection of DARA." *Major Issues Rulemaking* at 26. WFA has offered a response in

its brief at 35-36, explaining that BNSF's concern with double-counting is not problematic because step one recognizes that average variable costs do not vary with density, while step two recognizes that average total cost declines as density increases because the fixed costs are "spread over a larger number of traffic units," WFA Br. at 36. However, the Board never relied on this rationale and so cannot do so on appeal. *See SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947).

Accordingly, we grant the petitions in part, so that the Board on remand can address BNSF's double-counting objection to modified ATC, and we otherwise deny the petitions.